**FILED**

**JUL 2 2 2025**

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

UNITED STATES OF AMERICA

v.

TYESHA BOWMAN,
LIBRA MARTIN,
LAMONT FOSTER,
KHADIJAH BROWN, and
SIETA CARRINGTON

No.  25 CR 50036

Violations: Title 18, United States
Code, Sections 1341, 1343

JUDGE JOHNSTON

Magistrate Judge Schneider

## COUNTS ONE THROUGH SIXTEEN

The SPECIAL MARCH 2024 GRAND JURY charges that:

1.     At times material to this indictment:

### The Small Business Administration

a.     The U.S. Small Business Administration ("SBA") was a United States government agency that provided economic support to small businesses.

### The Paycheck Protection Program

b.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic.

c.     One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses and sole proprietors for job retention and certain other expenses, through a program called

the Paycheck Protection Program ("PPP"). Congress subsequently authorized an additional $465 billion in funding for PPP loans, for a total of about $814 billion.

        d.     To obtain a PPP loan, a business, sole proprietor, or self-employed individual submitted a PPP loan application (SBA Form 2483), which was signed by the applicant or an authorized representative of the business. The PPP loan application required the applicants to acknowledge the program rules and make certain affirmative certifications regarding the eligibility of the business, proprietorship, or individual. In the application, businesses, sole proprietors, and self-employed individuals were required to provide, among other things, their number of employees and average monthly payroll. This figure was used to calculate the applicant's eligibility and the amount of money the business, sole proprietor, or self-employed individual could receive under the PPP. Applicants were also required to make good faith certifications, including that the business entity was in operation on February 15, 2020, and that economic uncertainties had necessitated their loan requests for continued business operations.

        e.     To gain access to funds through the PPP, businesses, sole proprietorships, and self-employed individuals applied to lenders participating in the PPP and, if approved, received the loans from those lenders, either directly or through loan service providers, and the loans were 100% guaranteed by the SBA.

        f.     PPP loan proceeds were required to be used by the business, sole proprietorship, or self-employed individual for certain permissible expenses—payroll

costs, interest on mortgages, rent, utilities, and a limited amount of income paid to the owner. The PPP allowed the interest and principal on the PPP loan to be entirely forgiven by the SBA if the business, sole proprietorship, or self-employed individual spent the loan proceeds on these items within a designated period of time and used at least a certain percentage of the PPP loan for payroll expenses.

g.      Participating lenders, loan service providers, and the SBA required applicants for PPP loans to provide truthful information about the sole proprietorship, self-employed individual, or business and its owner, including truthful information about the applicant's payroll, income, operating expenses, and how the PPP loan would be used, which information was material to (i) lenders' approval, terms, and funding of loans and (ii) the SBA's decision to guarantee and to forgive the loans.

### The Economic Injury Disaster Loan Program

h.      Another source of relief provided by the CARES Act and other pandemic-relief legislation was the expansion of the Economic Injury Disaster Loan ("EIDL") Program, which provided loan assistance (including advances of up to $10,000) for businesses with 500 or fewer employees and other eligible entities. The EIDL Program was designed to provide economic relief to small businesses that were experiencing a temporary loss of revenue.

i.      To gain access to funds through the EIDL Program, small businesses applied through the SBA via an online portal and application. As part of

3

the EIDL application process, the SBA required applicants to submit truthful information about the applying entity, its owner, and its financial condition prior to the COVID-19 pandemic. This information included the entity's number of employees as of January 31, 2020; the entity's gross revenues and cost of goods sold for the 12-month period prior to January 31, 2020; and the entity's type of business (i.e., a business, an agricultural business, a sole proprietorship, a cooperative, among others); the date on which the business opened; and the date on which the current owner assumed ownership of the entity. Applicants were required to electronically certify that the information provided in the application was true and correct and were warned that a false statement or misrepresentation to the SBA may result in sanctions, including criminal penalties.

          j.     The SBA required applicants for EIDL loans to provide truthful information about the sole proprietorship, self-employed individual, or business and its owner, including truthful information about the applicant's number of employees, costs of goods sold, and gross revenue, which information was material to the SBA's approval, terms, and funding of loans.

          k.     EIDL loan applications were submitted directly to and processed by the SBA, and funds were issued to small-business applicants directly from the United States Treasury through the SBA.

          l.     EIDL Advance was a grant program offered together with the EIDL Program. EIDL Advance was designed to provide emergency economic relief to

businesses that were experiencing a temporary loss of revenue as a result of the COVID-19 pandemic. The applicant could request consideration for an EIDL advance in an application for an EIDL loan. The amount of the advance issued to the small-business applicant was determined by the number of employees indicated on the EIDL application, at $1,000 per employee, up to $10,000. The number of employees reported by the business was material to the SBA's funding of an EIDL Advance and determination of the amount of the EIDL Advance. If an EIDL advance was issued, the advance did not need to be repaid.

m.     If an EIDL application was approved by the SBA, the amount of the EIDL loan was determined in part based on the statements in the EIDL application about the entity's revenues and cost of goods sold for the 12 months prior to January 31, 2020.

n.     EIDL loan funds could be used to pay for the ordinary operating expenses and debts of the entity, including payroll, sick leave, production costs, utilities, rent, mortgage payments, continuation of health care benefits, and fixed debt payments.

### *Defendants*

o.     Defendant TYESHA BOWMAN was a resident of Rockford, Illinois and Janesville, Wisconsin. TYESHA BOWMAN was the owner and registered agent of FlyGirlWigs and Customs, LLC, an Illinois limited liability company

registered on or about June 23, 2020. TYESHA BOWMAN had a Facebook page in the name of "Ninha Brown."

      p.    Defendant LIBRA MARTIN was a resident of Rockford, Illinois. LIBRA MARTIN had a Facebook page in the name of "Libra Martin."

      q.    Defendant LAMONT FOSTER was a resident of Rockford, Illinois. LAMONT FOSTER had a Facebook page in the name of "Lito Foster."

      r.    Defendant KHADIJAH BROWN was a resident of Rockford, Illinois. KHADIJAH BROWN had a Facebook page in the name of "Khadijah Singleton."

      s.    Defendant SIETA CARRINGTON was a resident of Rockford, Illinois. SIETA CARRINGTON had a Facebook page in the name of "Nalla Carrington."

### *Lenders*

      t.    Lender A (Benworth Capital Partners, LLC) was a financial technology company which funded PPP loans to approved borrowers and was headquartered in Florida. Lender A maintained computer servers that were located outside of Illinois.

      u.    Lender B (Capital Plus Financial, LLC) was a financial technology company which funded PPP loans to approved borrowers and was headquartered in Texas. Lender B maintained computer servers that were located outside of Illinois.

6

v.     Lender C (Harvest Small Business Finance, LLC) was a financial technology company which funded PPP loans to approved borrowers and was headquartered in California. Lender C maintained computer servers that were located outside of Illinois.

w.     Lender D (Prestamos CDFI, LLC) was a community development financial institution which funded PPP loans to approved borrowers and was headquartered in Arizona. Lender D maintained computer servers that were located outside of Illinois.

### *The Scheme to Defraud*

2.     Beginning no later than in or around June 2020 and continuing until at least in or around July 2021, in the Northern District of Illinois, and elsewhere,

TYESHA BOWMAN, and
LIBRA MARTIN,

defendants herein, together with others known and unknown to the Grand Jury, knowingly devised, intended to devise, and participated in a scheme to defraud and to obtain money and property, in connection with applications for PPP and EIDL funds, by means of materially false and fraudulent pretenses, representations, and promises, as further described below.

3.     It was part of the scheme that TYESHA BOWMAN and LIBRA MARTIN (together, the "defendants"), for the purpose of fraudulently obtaining over $500,000 in PPP and EIDL funds, submitted and caused to be submitted over 25 applications for loans under the PPP and EIDL Programs, on behalf of businesses

7

and entities purportedly owned and operated by the defendants and others known and unknown to the grand jury, including FlyGirlWigs and Customs LLC, Libra Martin, Cinny Nailed It, J&R Foods, Dimes Dimes Customs, Our Ventures, and Young S-D Funeral and Cremation Service (together, "the purported borrowers"); which applications and supporting documentation contained materially false statements and misrepresentations, concerning, among other things, the purported borrowers' number of employees, gross revenues, payroll, cost of goods sold, operating expenses, type of business, and existence as companies with ongoing operations.

4. It was further part of the scheme that TYESHA BOWMAN solicited from other individuals, often through social media, personal identifying information ("PII"), such as addresses, birthdates, social security numbers, and bank account information, which information TYESHA BOWMAN used to prepare and submit false and fraudulent PPP and EIDL applications on behalf of the individuals, in exchange for a share of the approved loans' proceeds.

5. It was further part of the scheme that TYESHA BOWMAN prepared and submitted to Lenders A, B, C, and D (together, the "Lenders"), false and fraudulent PPP loan applications on behalf of the purported PPP borrowers, in which applications BOWMAN falsely and fraudulently represented that each purported PPP borrower was a business that employed a specified number of employees, paid a specified average monthly payroll, and was in operation on February 15, 2020. The defendants knew at the time that the purported borrowers had no employees or

8

payroll and were not in operation on February 15, 2020, and in many cases the purported PPP borrowers did not exist at all.

6.    It was further part of the scheme that, to substantiate the claimed number of employees and payroll of the purported PPP borrowers, TYESHA BOWMAN and LIBRA MARTIN prepared and submitted, and caused to be prepared and submitted, to the Lenders, copies of false IRS tax filings (including IRS Form 1040, Schedule C) that fraudulently represented the purported PPP borrowers' principal businesses and professions, yearly net profits, and total expenses. The defendants knew at the time that the purported PPP borrowers had no payroll or employees for which federal taxes were paid during that period.

7.    It was further part of the scheme that, through the submission of the false and fraudulent PPP loan applications and false and fraudulent supporting documentation, TYESHA BOWMAN and LIBRA MARTIN caused the Lenders to disburse over $500,000 in PPP and EIDL loan proceeds into bank accounts that were controlled by the defendants and by the individuals for whom the defendants prepared the false and fraudulent applications and supporting documentation.

8.    It was further part of the scheme that after the PPP funds were disbursed, TYESHA BOWMAN met with the other individuals for whom she prepared and submitted false and fraudulent PPP loan applications and received a portion of the fraudulently-obtained loan proceeds in exchange for her preparation and submission of the applications.

9.      It was further part of the scheme that TYESHA BOWMAN and LIBRA MARTIN misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the existence and purpose of the scheme and the acts done in furtherance of the scheme.

10.     It was further part of the scheme that, after the PPP loans were disbursed, in order to fraudulently obtain forgiveness of the PPP loans they obtained for themselves and others, TYESHA BOWMAN and LIBRA MARTIN submitted and caused to be submitted to the SBA or to the Lenders, loan forgiveness applications, knowing that the forgiveness applications contained false and fraudulent representations regarding the payroll costs for the purported sole proprietorships in the PPP applications and the truthfulness and accuracy of the loan application and supporting documents.

11.     On or about the dates set forth below, in the Northern District of Illinois, Western Division, and elsewhere, the defendants, as set forth below, for the purpose of executing the above-described scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, listed below, each such writing, sign, and signal constituting a separate

10

count:

| Count | Defendant(s) | Date | Description of Act |
|---|---|---|---|
| One | TYESHA BOWMAN & LIBRA MARTIN | May 23, 2021 | An internet transmission of a PPP loan application on behalf of "FlyGirlWigs and Customs, LLC," to Lender C's computer servers located outside of Illinois |
| Two | TYESHA BOWMAN & LIBRA MARTIN | July 9, 2021 | Wire transfer of approximately $15,000 in PPP loan proceeds from Lender C to BOWMAN's account ending in x9172 |
| Three | LIBRA MARTIN | April 11, 2021 | An internet transmission of a PPP loan application on behalf of "Libra Martin," to Lender D's computer servers located outside of Illinois |
| Four | LIBRA MARTIN | May 10, 2021 | Wire transfer of approximately $14,025 in PPP loan proceeds from Lender D to MARTIN's account ending in x1071 |
| Five | TYESHA BOWMAN & LIBRA MARTIN | April 15, 2021 | An internet transmission of a PPP loan application on behalf of "Cinny Nailed It," to Lender A's computer servers located outside of Illinois |
| Six | TYESHA BOWMAN & LIBRA MARTIN | April 22, 2021 | Wire transfer of approximately $20,833 in PPP loan proceeds from Lender A to C.B.'s account ending in x0771 |
| Seven | TYESHA BOWMAN & LIBRA MARTIN | April 14, 2021 | An internet transmission of a PPP loan application on behalf of "J&R Foods," to Lender C's computer servers located outside of Illinois |
| Eight | TYESHA BOWMAN & LIBRA MARTIN | April 27, 2021 | Wire transfer of approximately $20,833 in PPP loan proceeds from Lender C to J.G-F.'s account ending in x4183 |

11

| Count | Defendant(s) | Date | Description of Act |
|---|---|---|---|
| Nine | TYESHA BOWMAN & LIBRA MARTIN | April 1, 2021 | An internet transmission of a PPP loan application on behalf of "Dimes Dimes Customs," to Lender B's computer servers located outside of Illinois |
| Ten | TYESHA BOWMAN & LIBRA MARTIN | May 6, 2021 | Wire transfer of approximately $20,832 in PPP loan proceeds from Lender B to L.G.'s account ending in x3098 |
| Eleven | TYESHA BOWMAN & LIBRA MARTIN | April 22, 2021 | An internet transmission of a PPP loan application on behalf of "Our Ventures," to Lender A's computer servers located outside of Illinois |
| Twelve | TYESHA BOWMAN & LIBRA MARTIN | May 13, 2021 | Wire transfer of approximately $20,833 in PPP loan proceeds from Lender A to S.H.'s account ending in x1400 |
| Thirteen | TYESHA BOWMAN & LIBRA MARTIN | April 8, 2021 | An internet transmission of a PPP loan application on behalf of "Young S-D Funeral and Cremation Service," to Lender B's computer servers located outside of Illinois |
| Fourteen | TYESHA BOWMAN & LIBRA MARTIN | May 20, 2021 | Wire transfer of approximately $20,832 in PPP loan proceeds from Lender B to K.Y.'s account ending in x7135 |
| Fifteen | TYESHA BOWMAN | June 28, 2020 | An internet transmission of an EIDL loan application on behalf of "Our Ventures" through an SBA server located outside of Illinois |
| Sixteen | TYESHA BOWMAN | June 30, 2020 | Wire transfer of approximately $10,000 in EIDL loan proceeds from the SBA to S.H.'s account ending in x1470 |

In violation of Title 18, United States Code, Section 1343.

12

## COUNTS SEVENTEEN THROUGH THIRTY-NINE

The SPECIAL MARCH 2024 GRAND JURY further charges that:

12.     The allegations in paragraphs 1(b) and (o), (q), (r), and (s), and Counts One through Sixteen are incorporated here.

13.     Furthermore, at times material to the indictment:

### *Unemployment Insurance / Pandemic Unemployment Assistance*

a.     The Social Security Act established the dual program of federal and state unemployment benefits (UI).  Under the Act, each state administered its own unemployment program through their State Workforce Agency (SWA), within the guidelines of federal law.

b.     State unemployment benefits were financed in part by state payroll taxes, which were held in trust by the United States Department of Treasury's Unemployment Trust Fund.  State unemployment systems and benefits are largely financed by taxes on private employers located in that state.  When state unemployment benefits are exhausted, they may be supplemented by federal funds appropriated by the U.S. Department of Labor.  At times relevant to this indictment, the federal government was providing significant supplemental benefits to the states as a result of the COVID-19 pandemic.

c.     The CARES Act expanded states' ability to provide unemployment insurance for many workers impacted by the COVID-19 pandemic, including workers who were not ordinarily eligible for unemployment benefits.  The

Pandemic Unemployment Assistance ("PUA") Program allowed individuals who do not qualify for regular unemployment compensation and were unable to continue working as a result of COVID-19, such as self-employed workers and independent contractors, to file for unemployment benefits. PUA provided benefits to qualifying individuals who were otherwise able to work and available for work within the meaning of applicable state law, except that they were unemployed, partially unemployed, or unable or unavailable to work due to COVID-19 related reasons, as defined in the CARES Act. Unemployment benefit payments under PUA were retroactive for weeks of unemployment, partial employment, or inability to work due to COVID-19 reasons starting on or after January 27, 2020.

      d.    Normally, an unemployed worker initiates a UI claim in person, over the telephone, or on the Internet. The overwhelming majority of UI claims are filed online through a state website. Applicants have to answer specific questions to determine their eligibility to receive benefits, including their name, Social Security number, and mailing address. The amount of unemployment benefits that a UI claimant might be eligible for depends on several factors, including but not limited to previous employment and the amount of wages he or she earned. Generally, in Illinois, once a UI claimant was determined to be monetarily ineligible for regular UI, a claimant could then file for PUA benefits. If a PUA application was approved, PUA benefits could be distributed onto the debit cards that had already been mailed in connection with the UI applications. For PUA claims, applicants also had to self-

14

certify that they met a COVID-19-related reason for being unemployed, partially employed, or unable to work.

    e.    The SWA would make a determination about a UI claimant's eligibility for a UI claim based on the application made by the unemployed worker. If the SWA approved a UI claim, the claimant was required to periodically certify the claim via telephone or Internet at various times during the life of the claim, usually on a weekly or bi-weekly basis. The worker must also certify that he or she is still unemployed, is able to work, and is actively seeking work.

    f.    Residents of Illinois, California or Wisconsin, or individuals who resided in another state but worked primarily in Illinois, California, or Wisconsin respectively, and who became unemployed through no fault of their own, had the option of initiating their unemployment claim electronically via the website for their SWA, including the Illinois Department of Employment Security (IDES), the California Employment Development Department (EDD), and the Wisconsin Department of Workforce Development (DWD) respectively.

    g.    For approved claims, IDES paid the benefits via debit card issued by KeyBank. The debit cards were mailed to the claimant's mailing address via United States mail or a private or commercial interstate carrier.

    h.    For approved claims, EDD paid the benefits via debit card issued by Bank of America. The debit cards were mailed to the claimant's mailing address via United States mail or a private or commercial interstate carrier.

15

i. For approved claims, DWD paid the benefits via debit card issued by U.S. Bank. The debit cards were mailed to the claimant's mailing address via United States mail or a private or commercial interstate carrier.

j. The unemployment benefits were loaded onto the debit card electronically. Additional benefits are loaded electronically by the banks at intervals thereafter.

k. When a claimant using an internet protocol (IP) address registered to a physical address in Illinois filed a claim with an SWA, the servers used to process those claims were located outside the state of Illinois. For example, a California or Wisconsin claim filed from an IP address registered to an Illinois residence would be processed through a server located outside the state of Illinois. The servers IDES used to process PUA claims were located in Virginia.

### The Scheme to Defraud

14. Beginning no later than in or around July 2020 and continuing through at least in or around September 2021, in the Northern District of Illinois, and elsewhere,

TYESHA BOWMAN,
LAMONT FOSTER,
KHADIJAH BROWN, and
SIETA CARRINGTON,

defendants herein, knowingly devised, intended to devise, and participated in a scheme to defraud, and to obtain money and property, in connection with applications

16

for PUA funds, by means of materially false and fraudulent pretenses, representations, and promises, as further described below.

15.     It was part of the scheme that TYESHA BOWMAN, LAMONT FOSTER, KHADIJAH BROWN, and SIETA CARRINGTON (together, the "defendants"), for the purpose of fraudulently obtaining over $500,000 in UI (including PUA funds), prepared and submitted, and caused to be prepared and submitted, to the IDES, EDD, and DWD, over 50 applications for UI and PUA on behalf of themselves and other individuals, which applications contained materially false statements and misrepresentations concerning, among other things, whether the claimants actually worked at the businesses claimed in the applications, the dates on which those claimants worked at the businesses, and whether they were unemployed for a COVID-19-related reason. The defendants knew at the time that the claimants did not work at the businesses specified in the applications or were not unemployed for a COVID-19-related reason.

16.     It was further part of the scheme that BOWMAN acquired, often through social media, the names, social security numbers, and other PII of individuals, for the purpose of submitting false and fraudulent UI and PUA applications, sometimes with their knowledge and consent and sometimes without their knowledge or consent.

17.     It was further part of the scheme that BOWMAN or her co-schemers periodically certified that the individuals claimed in the fraudulent applications

17

continued to be eligible for PUA benefits in order for BOWMAN and her co-schemers to continue to obtain PUA benefits from the relevant SWAs.

18.    It was further part of the scheme that defendants opted to have the fraudulent unemployment benefits paid via debit cards that were mailed to residences connected to defendants and others involved in the scheme.

19.    It was further part of the scheme that TYESHA BOWMAN, LAMONT FOSTER, KHADIJAH BROWN, and SIETA CARRINGTON received via the United States Postal Service and private or commercial interstate carriers debit cards that were mailed by the SWAs as a result of the false and fraudulent UI and PUA applications, including in the names of other unnamed co-schemers, as well as in the names of unwitting individuals whose PII BOWMAN had obtained.

20.    It was further part of the scheme that, through the submission of the false and fraudulent UI and PUA applications, the defendants caused the SWAs to disburse over $500,000 in UI (including PUA benefits) onto the debit cards that were mailed to TYESHA BOWMAN, LAMONT FOSTER, KHADIJAH BROWN, SIETA CARRINGTON, and to other individuals.

21.    It was further part of the scheme that, after receiving fraudulently obtained debit cards in the mail, KHADIJAH BROWN and SIETA CARRINGTON provided the debit cards to TYESHA BOWMAN.

22.    It was further part of the scheme that other individuals who received fraudulently obtained debit cards in the mail paid a portion of the fraudulently-

18

obtained PUA benefits to TYESHA BOWMAN, in exchange for BOWMAN submitting the false and fraudulent UI and PUA applications on their behalf.

23.   It was further part of the scheme that TYESHA BOWMAN and LAMONT FOSTER withdrew PUA funds from fraudulently-obtained debit cards via automated teller machines ("ATMs") and used the fraudulently-obtained PUA funds for their personal use and benefit.  These ATM withdrawals were accomplished by utilizing computer servers that were operating in interstate commerce.

24.   It was further part of the scheme that TYESHA BOWMAN, LAMONT FOSTER, KHADIJAH BROWN, and SIETA CARRINGTON misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the existence and purpose of the scheme and the acts done in furtherance of the scheme.

25.   On or about the dates set forth below, in the Northern District of Illinois, Western Division, and elsewhere, defendants, as set forth below, for the purpose of executing the above-described scheme, and attempting to do so, knowingly caused to be delivered by the U.S. mail or commercial interstate carrier, namely, FedEx, according to the direction thereon, envelopes addressed to the individuals listed below at the locations listed below, which envelopes contained debit cards designed to receive unemployment benefits (including PUA benefits) from SWAs, as listed below, each mailing constituting a separate count:

| Count | Defendant | Date | Mailing |
|---|---|---|---|
| Seventeen | TYESHA BOWMAN and LAMONT FOSTER | August 31, 2020 | Mailed debit card in the name of LAMONT FOSTER from Bank A to an address in Rockford, Illinois |
| Eighteen | TYESHA BOWMAN and KHADIJAH BROWN | September 11, 2020 | Mailed debit card in the name of P.C. from Bank A to BROWN's address in Love's Park, Illinois |
| Nineteen | TYESHA BOWMAN and KHADIJAH BROWN | September 11, 2020 | Mailed debit card in the name of T.B. from Bank A to BROWN's address in Love's Park, Illinois |
| Twenty | TYESHA BOWMAN and SIETA CARRINGTON | March 10, 2021 | Mailed debit card in the name of J.M. from Bank A to CARRINGTON's address in Rockford, Illinois |
| Twenty-One | TYESHA BOWMAN and LAMONT FOSTER | September 7, 2021 | Mailed debit card in the name of LAMONT FOSTER from Bank B to an address in Rockford, Illinois |
| Twenty-Two | TYESHA BOWMAN | September 7, 2021 | Mailed debit card in the name of E.E. from Bank B to an address in Rockford, Illinois |

In violation of Title 18, United States Code, Section 1341.

26. On or about the dates set forth below, in the Northern District of Illinois, Western Division, and elsewhere, the defendants, as set forth below, for the purpose of executing the above-described scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, listed below, each such writing, sign, and signal constituting a separate count:

| Count | Defendant | Date | Interstate Wire Transmission |
|---|---|---|---|
| Twenty-Three | TYESHA BOWMAN | August 3, 2020 | Online submission of PUA claim to IDES in the name of S.A. through servers located outside Illinois |
| Twenty-Four | TYESHA BOWMAN | August 3, 2020 | Online submission of PUA claim to Wisconsin DWD in the name of S.A. through servers located outside Illinois |
| Twenty-Five | TYESHA BOWMAN and LAMONT FOSTER | September 30, 2020 | Online submission of PUA claim to IDES in the name of LAMONT FOSTER through servers located outside Illinois |
| Twenty-Six | TYESHA BOWMAN | October 2, 2020 | Online submission of PUA claim to IDES in the name of P.C. through servers located outside Illinois |
| Twenty-Seven | TYESHA BOWMAN | October 12, 2020 | Online submission of PUA claim to IDES in the name of T.B. through servers located outside Illinois |
| Twenty-Eight | TYESHA BOWMAN | December 15, 2020 | Online submission of PUA claim to IDES in the name of J.M. through servers located outside Illinois |
| Twenty-Nine | TYESHA BOWMAN and LAMONT FOSTER | August 25, 2021 | Online submission of PUA claim to California EDD in the name of LAMONT FOSTER through servers located outside Illinois |

| Count | Defendant | Date | Interstate Wire Transmission |
|---|---|---|---|
| Thirty | TYESHA BOWMAN | August 31, 2021 | Online submission of PUA claim to California EDD in the name of E.E. through servers located outside Illinois |

In violation of Title 18, United States Code, Section 1343.

27. On or about the dates set forth below, in the Northern District of Illinois, Western Division, and elsewhere, the defendants, as set forth below, for the purpose of executing the above-described scheme, knowingly caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, and signals, listed below, each such writing, sign, and signal constituting a separate count:

| Count | Defendant | Date | Interstate Wire Transmission |
|---|---|---|---|
| Thirty-One | LAMONT FOSTER | November 5, 2020 | An electronic request to withdraw approximately $503 from a Bank of America ATM located in Rockford, Illinois, using a KeyBank debit card issued in the name of T.B. and ending in x9620 |
| Thirty-Two | TYESHA BOWMAN | November 6, 2020 | Electronic requests to withdraw approximately $986 from a Bank of America ATM located in Rockford, Illinois, using a KeyBank debit card issued in the name of T.B. and ending in x9620 |
| Thirty-Three | LAMONT FOSTER | November 9, 2020 | Electronic requests to withdraw approximately $1,006 from a Bank of America ATM located in Rockford, Illinois, using a KeyBank debit card issued in the name of T.B. and ending in x9620 |
| Thirty-Four | TYESHA BOWMAN | November 11, 2020 | Electronic requests to withdraw approximately $1,006 from a Bank of America ATM located in Rockford, Illinois, using a KeyBank debit card issued in the name of T.B. and ending in x9620 |

| Count | Defendant | Date | Interstate Wire Transmission |
|---|---|---|---|
| Thirty-Five | TYESHA BOWMAN | December 2, 2020 | An electronic request to withdraw approximately $503 from a Chase Bank ATM located in Rockford, Illinois, using a KeyBank debit card issued in the name of P.C. and ending in x4578 |
| Thirty-Six | TYESHA BOWMAN | December 6, 2020 | An electronic request to withdraw approximately $503 from a Chase Bank ATM located in Rockford, Illinois, using a KeyBank debit card issued in the name of P.C. and ending in x4578 |
| Thirty-Seven | LAMONT FOSTER and TYESHA BOWMAN | December 7, 2020 | An electronic request to withdraw approximately $483 from a Chase Bank ATM located in Rockford, Illinois, using a KeyBank debit card issued in the name of P.C. and ending in x4578 |
| Thirty-Eight | LAMONT FOSTER | December 11, 2020 | Electronic requests to withdraw approximately $2,097.50 from a PNC Bank ATM located in Rockford, Illinois, using a KeyBank debit card issued in the name of P.C. and ending in x4578 |
| Thirty-Nine | TYESHA BOWMAN | December 12, 2020 | Electronic requests to withdraw approximately $987 from a PNC Bank ATM located in Rockford, Illinois, using a KeyBank debit card issued in the name of P.C. and ending in x4578 |

In violation of Title 18, United States Code, Section 1343.

24

## FORFEITURE ALLEGATION

The SPECIAL MARCH 2024 GRAND JURY further alleges:

1.     Upon conviction of an offense in violation of Title 18, United States Code, Sections 1341 and 1343, as set forth in this Indictment, defendants shall forfeit to the United States of America any property which constitutes and is derived from proceeds traceable to the offense, as provided in Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2.     The property to be forfeited includes, but is not limited to a personal money judgment in an amount equal to the proceeds derived from the offenses in violation of Title 18, United States Code, Sections 1343 and 1341, estimated to be over $500,000.

3.     If any of the property described above, as a result of any act or omission by a defendant: cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the

25

United States of America shall be entitled to forfeiture of substitute property, as
provided in Title 21, United States Code, Section 853(p).

A TRUE BILL:

FOREPERSON

UNITED STATES ATTORNEY

26